No. 24-7781

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

KENDLE RASHEN HAWKINS,

Defendant-Appellant.

On Appeal from the United States District Court
For the Western District of Washington, Tacoma Division
No. 3:21-CR-05213-DGE-1
Honorable Ricardo S. Martinez and David G. Estudillo

---

**APPELLANT'S OPENING BRIEF**

---

Lynn C. Hartfield
LAW OFFICE OF LYNN C. HARTFIELD, LLC
387 Corona Street, Suite 617
Denver, Colorado 80218
(720) 588-0571
lynn@lhartfieldlaw.com

CJA Attorney for Appellant Kendle Hawkins

May 21, 2025

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................... 1

INTRODUCTION .................................................................................. 2

ISSUES PRESENTED ........................................................................... 4

STATEMENT OF THE CASE AND FACTS ........................................ 4

SUMMARY OF THE ARGUMENT .................................................... 16

ARGUMENT ......................................................................................... 18

I.    THE DISTRICT COURT CORRECTLY HELD THAT THE
WARRANT TO TRACK MR. HAWKINS'S COMMUNICATIONS
AND MOVEMENTS VIA GPS WAS NOT SUPPORTED BY
PROBABLE CAUSE ..................................................................... 18

    A.    Preservation and Standard of Review .................................... 18

    B.    The First Affidavit Was Insufficient to Establish Probable Cause
That Electronic Data For The Phone Identified As "TT86" Would
Yield Evidence That Mr. Hawkins Was Engaged In Drug
Trafficking or Was Associated With the Michael Walker DTO ........ 19

II.    THE SECOND/CELL SITE SIMULATOR WARRANT WAS
INVALID BECAUSE IT CONTAINED NO NEW INFORMATION
OTHER THAN GPS DATA OBTAINED VIA THE FIRST TAINTED
WARRANT .................................................................................... 25

III.    THE DISTRICT COURT ERRED IN FINDING THAT THE *LEON*
GOOD FAITH EXCEPTION APPLIED ...................................... 27

    A.    The Affidavit in This Case Was So Bare Bones That Agent McCann
Could Not Reasonably Have Relied on It ............................... 29

    B.    The *Leon* Good Faith Exception Does Not Apply Because the
Portion of the Affidavit Relating to Mr. Hawkins's Phone Contained
Material Omissions ................................................................ 34

    C.    *Leon* Prohibits the Use of Illegally Obtained Evidence to Support
Issuance of a Search Warrant ................................................ 37

IV.   THE TRAFFIC STOP DOES NOT PROVIDE AN INDEPENDENT SOURCE FOR THE DISCOVERY OF THE EVIDENCE LEADING TO THE SEARCH OF THE VEHICLE IN WHICH MR. HAWKINS WAS TRAVELING ..................................................... 41

V.   EVEN IF THE TRAFFIC STOP COULD BE JUSTIFIED ON INDEPENDENT GROUNDS, THE STOP WAS IMPERMISSIBLY EXTENDED FOR THE PURPOSE OF CONDUCTING A NARCOTICS INVESTIGATION ............................................... 47

CONCLUSION ............................................................... 51

STATEMENT OF RELATED CASES ................................. 52

CERTIFICATE OF COMPLIANCE ................................... 53

CERTIFICATE OF SERVICE ........................................... 54

# TABLE OF AUTHORITIES

<u>Cases</u>

*Franks v. Delaware*, 438 U.S. 154 (1978) ....................................................... 13

*Herring v. United States*, 555 U.S. 135 (2009) ...................................... 38, 39

*Illinois v. Gates*, 462 U.S. 213 (1983) ......................................................... 19

*Illinois v. Wardlow*, 528 U.S. 119 (2000) ..................................................... 48

*Murray v. United States*, 487 U.S. 533 (1988) ...................................... 43, 44

*Reid v. Georgia*, 448 U.S. 438 (1980) ........................................................... 27

*Rodriguez v. United States*, 575 U.S. 348 (2015) .................................. 47, 48

*United States v. Angulo-Lopez*, 791 F.2d 1394 (9th Cir. 1986) ................. 31

*United States v. Artis*, 919 F.3d 1123 (9th Cir. 2019) .......................... 38, 39

*United States v. Bishop*, 264 F.3d 919 (9th Cir. 2001) ............................... 19

*United States v. Chamberlin*, 644 F.2d 1262 (9th Cir. 1980) .................... 43

*United States v. Chavez-Valenzuela*, 268 F.3d 719 (9th Cir. 2001) .......... 49

*United States v. Dozier*, 844 F.2d 701 (9th Cir. 1988) ............................... 24

*United States v. Driver*, 776 F.2d 807 (9th Cir. 1985) ............................... 26

*United States v. Freitas*, 716 F.2d 1216 (9th Cir. 1983) ...................... 21, 22

*United States v. Gorman*, 859 F.3d 706 (9th Cir. 2017) ...................... 45, 46

*United States v. Grant*, 682 F.3d 827 (9th Cir. 2012)........................ 29, 31, 32, 33

*United States v. Hall*, 113 F.3d 157 (9th Cir. 1997) ............................. 22, 23

*United States v. Holmes*, 121 F.4th 727 (9th Cir. 2024) ........................................... 42

*United States v. Johns*, 891 F.2d 243 (9th Cir. 1989) ......................................... 42, 50

*United States v. Kow*, 58 F.3d 423 (9th Cir. 1995) ................................................ 28

*United States v. Krupa*, 658 F.3d 1174 (9th Cir. 2011) ........................................... 19

*United States v. Landeros*, 913 F.3d 862 (9th Cir. 2019) ......................................... 48

*United States v. Leon*, 468 U.S. 897 (1984) .................................................. 27, 28, 29

*United States v. Luong*, 470 F.3d 898 (9th Cir. 2006) ......................................... 29, 30

*United States v. Monghur*, 588 F.3d 975 (9th Cir. 2009) ......................................... 18

*United States v. Montero-Camargo*, 208 F.3d 1122 (9th Cir. 2000) ......................... 48

*United States v. Namer*, 835 F.2d 1084 (5th Cir. 1988) ........................................... 42

*United States v. Needham*, 718 F.3d 1190 (9th Cir. 2013) ....................................... 18

*United States v. Ramirez-Sandoval*, 872 F.2d 1392 (9th Cir. 1989) ......................... 42

*United States v. Rowland*, 464 F.3d 899 (9th Cir. 2006) .......................................... 21

*United States v. Schesso*, 730 F.3d 1040 (9th Cir. 2013) ........................................ 24

*United States v. Underwood*, 725 F.3d 1076 (9th Cir. 2013) ................................... 19

*United States v. Vasey*, 834 F.2d 782 (9th Cir. 1987) .................................... 37, 38, 40

*United States v. Wanless*, 882 F.2d 1459 (9th Cir. 1989) ........................................ 38

*Washington v. Lambert*, 98 F.3d 1181 (9th Cir. 1996) ............................................ 49

*Wong Sun v. United States*, 371 U.S. 471 (1963) .................................................... 26

iv

## Statutes

18 U.S.C. § 3231 ......................................................................................... 1

18 U.S.C. § 3742(a) .................................................................................... 1

18 U.S.C. § 924(c)(1) ................................................................................. 4

21 U.S.C. § 841(a)(1) ................................................................................. 4

28 U.S.C. § 1291 ........................................................................................ 1

RCWA 9.41.050 (2003) ............................................................................ 49

RCWA 9.41.370 ........................................................................................ 49

## JURISDICTIONAL STATEMENT

This is a direct appeal from a conviction and sentence issued in a criminal case. The district court for the Western District of Washington had subject-matter jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

Judgment was entered below on December 19, 2024. (1-ER-11).[1] Notice of appeal was timely filed on December 26, 2024. (3-ER-377). Mr. Hawkins is in the custody of the Bureau of Prisons serving a 10-year sentence, with a projected release date of December 21, 2029.

---

[1] References to the excerpts of record shall be designated "[volume number]-ER-[page number]."

## INTRODUCTION

Should law enforcement be able to obtain a warrant to track every call and movement of an individual's cell phone based solely on an accusation by a paid informant that the owner is a drug distributor? Should there be an obligation to corroborate at least some information beyond that the cell phone was used by a person with the same name? And once such warrant is erroneously approved, should law enforcement be able to use information gained from that tracking to conduct a targeted traffic stop that includes a K9 search of the car?

These are the questions posed in this case. Presented with nothing more than an informant tip that "Kendle" drove loads of cocaine from Arizona to Seattle to distribute to a known dealer, and that a phone number provided by the informant appeared to be associated with someone named Kendle, a magistrate judge approved a broad warrant that allowed the government to use GPS data to track Appellant Kendle Hawkins's every move. Using information gained through tracking the phone, which showed an air travel trip from Phoenix to Seattle and, several weeks later, what appeared to be travel by car heading north from Phoenix to Sacramento, the same agent sought another warrant to more precisely pinpoint the phone's location. Using this data, the agent enlisted local law enforcement to stop the car for a minor traffic violation, and deploy a drug-sniffing dog, who miraculously alerted on an area of the car where no drugs were ultimately found, and who had not

2

been trained to detect the specific drug ultimately recovered during a comprehensive search of the vehicle.

This case raises serious questions about the extent to which law enforcement can obtain permission to track a citizen's every move via their cell phone, based on a bare accusation by an informant. The case also raises the question about whether, having managed to slide the request by a judge by burying it in an application to track other phones for which significantly more evidence supported the request, law enforcement can use information gained from the erroneously granted warrant to further track and conduct searches of the phone's owner and property.

The district court resolved the issue by holding that the officers acted in good faith. But nothing about the sequence of events looks like good faith. Instead, the inescapable conclusion is that law enforcement evaded their responsibility to conduct actual investigation before targeting an individual by such intrusive means, and then used the information to conduct a traffic stop and dog sniff that otherwise would not have occurred. This Court should not sanction such conduct, and should reverse Mr. Hawkins's convictions.

## ISSUES PRESENTED

I.    WHETHER THE DISTRICT COURT CORRECTLY HELD THAT THE WARRANT TO TRACK MR. HAWKINS'S COMMUNICATIONS AND MOVEMENTS VIA GPS WAS NOT SUPPORTED BY PROBABLE CAUSE

II.    WHETHER THE SECOND/CELL SITE SIMULATOR WARRANT WAS INVALID BECAUSE IT CONTAINED NO NEW INFORMATION OTHER THAN GPS DATA OBTAINED VIA THE ORIGINAL TAINTED WARRANT

III.    WHETHER THE DISTRICT COURT ERRED IN FINDING THAT THE *LEON* GOOD FAITH EXCEPTION APPLIED

IV.    WHETHER THE DISTRICT COURT ERRED IN FINDING THAT THE SEARCH WAS VALIDATED BY A SOURCE INDEPENDENT FROM THE TAINTED WARRANTS

V.    WHETHER, EVEN IF THE TRAFFIC STOP COULD BE JUSTIFIED ON INDEPENDENT GROUNDS, THE STOP WAS IMPERMISSIBLY EXTENDED FOR THE PURPOSE OF CONDUCTING A NARCOTICS INVESTIGATION

## STATEMENT OF THE CASE AND FACTS

On June 14, 2021, Mr. Hawkins was arrested and charged by complaint with one count of possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a)(1), and one count of carrying five enumerated firearms during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). (2-ER-19-20). The charges arose from a traffic stop near Centralia, Washington, after which officers obtained a warrant to search a rental car in which Mr. Hawkins was the passenger, ultimately recovering fentanyl and several unloaded firearms. (2-ER-24-28).

The traffic stop, however, was no mere fortuity; the FBI had been tracking Mr. Hawkins's movements for almost a month, and had been tracking his precise location since he had left his home in Phoenix the day before. (2-ER-24-27). As the complaint explained, a confidential source ("CS") had told agents that an Arizona man named "Kendle" supplied cocaine to an individual named Kenneth Lee, who was himself entangled in a larger investigation that led to his arrest on April 7, two months before the traffic stop. (2-ER-24). The only other information the CS supplied was a phone number for "Kendle" and the allegation that "Kendle" used rental cars to travel between Arizona and Seattle, hiding kilogram quantities of cocaine that he then distributed to dealers in the Seattle area including Lee. (*Id.*).

The CS's tip about "Kendle" found its way into an application for a search warrant and pen-trap order for four other phones connected to the larger investigation; he alone was new to the investigation. (2-ER-69-87). In the 37-page affidavit, authored by FBI Special Agent Shawna McCann, she describes how beginning in 2019, a joint FBI-Seattle Police Department task force began investigating a drug trafficking organization ("DTO") believed to be headed by an individual named Michael Walker. (2-ER-69-70). The wide-ranging investigation led to several rounds of court-authorized wiretaps of five phones belonging to suspected members of the DTO. (2-ER-70). The warrant application sought authorization for renewed GPS location data, pen register and trap and trace monitoring for three of

5

the phones suspected of belonging to active members of the DTO, and sought an initial authorization for a phone believed to belong to another high level member of the DTO, based on calls intercepted through previously approved wiretaps. (2-ER-69-86). Almost as an afterthought, the application sought authorization for a pen register, trap and trace order, and GPS location data for a phone designated "TT86," which was the phone number the CS alleged belonged to "Kendle." (2-ER-86-87).

The affidavit disclosed, albeit in a footnote, that the CS was a paid informant with the Seattle Police Department who had a criminal history that included multiple convictions for crimes of dishonesty and making false statements to law enforcement. (2-ER-86 n.12). There was no information in the affidavit about how the CS acquired knowledge about Mr. Hawkins's alleged activities or whether the information was firsthand.

As grounds for the authorization, the affidavit, in just two paragraphs, explained that based on the CS's tip about "Kendle," law enforcement used databases to confirm that the phone number supplied by the CS was "associated with" a Phoenix address listed for a Kendle Hawkins, and that subscriber information for the phone showed a billing address also associated with Kendle Hawkins in a CLEAR database. (2-ER-86). McCann also included a generalized, unsupported proposition that she knew based on her training and experience that "it

is common for drug traffickers to subscribe cell phones under false names to evade law enforcement detection." (*Id.*).

Despite the thinness of the information in the affidavit, particularly when compared to the information supporting the authorizations for the other four phones, on May 20, 2021 Magistrate Judge S. Kate Vaughan approved the application. (2-ER-103, hereinafter the "GPS warrant"). Armed with the order, McCann and her team began monitoring the phone's movements. On May 23, 2021, agents were able to use GPS location data to determine that the phone left Phoenix, travelled by air to SeaTac airport, travelled to a few locations in the Seattle and Tacoma area, and then flew back to Phoenix.[2] (2-ER-137).

On June 13, 2021, agents monitoring the phone noted that "TT86" was traveling north from Phoenix. (2-ER-228). After observing the phone stop for several hours in Sacramento and then drive north on Interstate 5, McCann sought authorization to use a cell site simulator, described as a device that communicates with cellular infrastructure to more precisely determine a phone's location in real time. (2-ER-228-30). The cell site simulator ("CSS") warrant application built upon

---

[2] McCann mistakenly represented that the phone left Phoenix early the morning of May 23, 2021 and returned at 10:50 p.m. the same day; it was later determined that McCann failed to convert the time stamps on the location data from GMT to Pacific time. (2-ER-172). Mr. Hawkins supplied flight receipts demonstrating that he left Phoenix the evening of May 22 and returned the following day. (2-ER-146-54).

information gathered from the GPS warrant, and aside from the original tip from the CS, the only new information it contained was a description of the May 23 Phoenix-to-Seattle air trip and the fact that the phone now appeared to be driving north from Phoenix.[3] (2-ER-228). In her affidavit, McCann stated that agents intended to conduct a traffic stop on the car in which TT86 was traveling, and deploy a narcotics K9 "to investigate whether Kendle Hawkins's travel is to facilitate drug trafficking." (*Id.*). The GPS location data already available through the first warrant, McCann explained, was too imprecise to determine the exact location of the phone in real time. (*Id.*).

After Magistrate Judge Brian Tsuchida approved the CSS warrant, agents were able to track the phone traveling through Oregon and across the border into Washington state, and were able to hone in on the car in which the phone was traveling. (2-ER-161). Multiple agents were positioned along I-5 awaiting the vehicle, and when the occupants of the car stopped for gas, agents were able to determine that an unknown male was driving the car, and were able to identify the passenger as

---

[3] Although McCann represents that the car was going "north toward Seattle," there was no information at the time that the car was going towards Seattle specifically, but rather was instead simply driving north. In fact, the phone traveled to Sacramento and stopped for several hours, then continued traveling north on Interstate 5. Sacramento is approximately 750 miles from Seattle by car. *See* https://www.distancecalculator.net/from-seattle-to-sacramento.

Mr. Hawkins based on his driver's license photo. (2-ER-160-61). Agents also ran the license plate and determined the vehicle was a rental car. (*Id.*).

As the phone traveled north, investigating agents enlisted local law enforcement officers to track the vehicle's speed and to provide a K9 for deployment once the car was stopped. (2-ER-161). Two reports in the record detail what happened next. In the first, an FBI-302 authored by Agent McCann, she states that "Sgt. Matt Hendry" (who is not identified by agency) clocked the car driving at 78 miles per hour in a 70 mile per hour zone. (*Id.*). Centralia Officer Steve Summers, who was traveling with his K9 and a task force officer, Rob Thomas, was selected to conduct the traffic stop. (*Id.*). The report makes clear that the basis for the stop was "the speeding infraction and the independent probable cause developed by agents from CS information, GPS location data for TT86, and physical surveillance." (*Id.*).

The second report, authored by Centralia Police Officer Summers, contains some inconsistencies with McCann's report. (2-ER-263). He reports that the car was stopped because it was traveling at 75 miles per hour (not 78) in a 60 mile per hour zone (not 70). (*Id.*). More important, the sequence of events is reported differently in the two reports.

McCann states in her report that officers first requested vehicle registration and identification from both the driver, Appleton, and Mr. Hawkins. (2-ER-161).

9

When Appleton leaned over to open the glove compartment to retrieve the registration, Thomas observed a high capacity drum magazine inside. (*Id.*). When asked what the item was, Mr. Hawkins told him it was not loaded. (*Id.*). At that point, Appleton and Mr. Hawkins were ordered out of the car. (*Id.*).

According to McCann, the officers then questioned Appleton and Mr. Hawkins about their travel plans. (2-ER-162). Appleton told them he lived in Washington, but had flown to Phoenix a few weeks earlier to visit his girlfriend; Mr. Hawkins said he was driving with Appleton to Washington and planned to fly back to Phoenix. (*Id.*). TFO Thomas said he noticed that Appleton seemed nervous. (*Id.*).

McCann states that after the two men were ordered out of the car, Summers deployed his K9 to conduct a search of the car, and the dog alerted on the front passenger side of the car, where the window was rolled down. (*Id.*). When informed that the dog had alerted to the presence of either cocaine, methamphetamine or heroin in the car, Mr. Hawkins told the officer he had just smoked marijuana. (*Id.*).

Summers, on the other hand, states in his report that he initially only requested identification from Appleton, and that he began questioning him about his travel plans *before* he requested the rental agreement. (2-ER-263). When questioned about why Summers could only see one suitcase in the back of the car, Appleton said he had been visiting his girlfriend and had clothes stored at her home, so he had

not brought luggage with him. (*Id.*). Summers's report also states that when he asked Appleton for the rental agreement, the passenger—who had not yet been identified— not Appleton, opened the glove compartment, exposing the handgun magazine. (*Id.*). Summers's report says nothing about Mr. Hawkins volunteering that the magazine was not loaded. (*Id.*).

Both reports place Mr. Hawkins and Appleton outside the car when Summers's K9 conducted its search. (2-ER-162; 2-ER-263). Summers states that the dog, who was certified to recognize only cocaine, methamphetamine and heroin, alerted on the front passenger side, which had an open window. (v.2-ER-263). No bodycam video of the dog search was ever introduced into evidence. When Summers advised Mr. Hawkins and Appleton about the alert, Mr. Hawkins advised that he had recently smoked marijuana. (2-ER-263-64). Summers responded that the dog did not alert to the odor of marijuana. (*Id.*).

After Mr. Hawkins and Appleton declined to consent to a search of the car, McCann applied for and was granted a warrant to do so. (2-ER-127). The application for the warrant, tracking the FBI-302, noted that the traffic stop had been conducted both for the speeding violation and the "independent probable cause" from the CS tip, GPS location data and physical surveillance. (2-ER-139). While Mr. Hawkins and Appleton remained detained, a team of 14 officers from the FBI, DEA, Seattle Police Department and narcotics task force searched the car,

recovering five firearms, all of which were unloaded, two empty magazines from the trunk of the car, the drum magazine that had been seen in the glove box, two suppressors and a quantity of blue pills, later determined to be fentanyl. (2-ER-163-64). This evidence formed the basis of the charges against Mr. Hawkins. Appleton was not charged in connection with the incident. Mr. Hawkins was also never charged in connection with activities of the Walker DTO.

Prior to trial, Mr. Hawkins filed a motion to suppress the evidence recovered from the rental car. (2-ER-34). As grounds, Mr. Hawkins asserted that the affidavit in support of the application for the GPS warrant failed to establish probable cause. (2-ER-45-52). Specifically, he argued that the information supplied by the CS, whom the government admitted had convictions for crimes of dishonesty as well as outstanding warrants, lacked corroboration of any incriminating details and was too thin to establish probable cause to believe Mr. Hawkins was trafficking in drugs. (*Id.*). Further, he noted that despite the investigation into the larger DTO having been underway for nearly two years, there did not appear to be any communication between TT86 (Mr. Hawkins's phone), and any other member of the DTO, nor were there any allegations that Mr. Hawkins had been seen with any member of the DTO. (*Id.*).

Mr. Hawkins also asserted that McCann failed to include material information in the affidavit, including the fact that Kenneth Lee, the member of the DTO whom

the CS had alleged Mr. Hawkins supplied with cocaine, had been arrested on April 7, over a month before she submitted the affidavit for the GPS warrant. (2-ER-52-55). In addition, the affidavit failed to advise that another individual had been identified as Lee's supplier, and that despite extensive surveillance of DTO members' phones, no evidence recovered in the investigation connected Mr. Hawkins to any DTO member. (*Id.*). Mr. Hawkins argued that because the initial GPS warrant was not supported by probable cause, evidence obtained as a result could not support the other warrants. (2-ER-55-56). He also asserted that the vehicle stop was prolonged beyond that necessary to issue a citation for speeding and that consequently, evidence derived from the K9 search was subject to suppression. (*Id.*). Mr. Hawkins requested an evidentiary hearing and hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). (2-ER-34, 42).

In response, the government claimed that McCann's affidavit was sufficient to establish probable cause for the GPS warrant, given the CS's track record of providing reliable tips and the fact that agents corroborated some of the information the CS supplied. (2-ER-177-81). It also asserted that the stop, dog sniff and vehicle search were constitutional because they were supported by the independent basis that the driver of the vehicle was speeding. (2-ER-183-86). The government conceded, however, that "the true purpose of th[e] stop was to investigate the crime of transporting controlled substances," and argued the K9 search therefore did not

13

prolong the stop. (2-ER-186). Finally, the government urged that even if there were flaws in the GPS or other warrants, the *Leon* good faith exception should apply. (2-ER-198-200).

The district court, without granting an evidentiary hearing or *Franks* hearing, denied Mr. Hawkins's motion. (1-ER-2). Although it agreed that the affidavit for the initial GPS warrant was "too thin and insufficiently reliable," it found there was a valid independent basis for the traffic stop and subsequent search:

> The traffic stop for speeding is not questioned by Defendant. Shortly after the stop, officers applied a K-9 to the exterior of the car to determine whether the odor of drugs was present .... To put it all together: the traffic stop was valid, the officers on the scene had reasonable suspicion of a crime, they extended the stop consistent with their larger mission (which was not invalidated by the lack of probable cause for the GPS warrant), and after the dog alerted they had probable cause to conduct the subsequent search.

(1-ER-5). The court also agreed with the government that the *Leon* good faith exception applied. (1-ER-6-7). Thus, it concluded, there was no need for a *Franks* hearing with respect to any of warrants. (*Id.*).

A few weeks after the order was issued, Mr. Hawkins's retained counsel withdrew, and two CJA attorneys were appointed. (3-ER-277-78). Mr. Hawkins's new attorneys filed, among other motions, a motion to suppress evidence recovered from the traffic stop. (3-ER-281). In this motion, Mr. Hawkins urged that not only was the first/GPS warrant unsupported by probable cause, as the district court had found, but the second/CSS warrant, was similarly deficient. (3-ER-281-88). Mr.

Hawkins contended that because the affidavits for the two warrants were bare bones within the meaning of *Leon*, the good faith exception did not apply. (3-ER-288-92). The evidence derived from the traffic stop was thus subject to suppression as the fruit of the poisonous tree, because without evidence gained through the GPS or CSS warrants, officers would not have known to stop the rental car in which Mr. Hawkins was traveling or deploy a K9 to conduct a search. (3-ER-292).

The government responded that the motion was effectively the same as the first motion, and therefore was simply a disfavored motion to reconsider. (3-ER-331-32). However, it should be noted that at the time new counsel was appointed, the district court issued an order setting a new pretrial motions date, and the second motion to suppress, which raised new issues relating to the CSS warrant, was timely filed. (*See* 3-ER-279-81).

In its response, the government also reaffirmed its position that the *Leon* good faith exception applied to the insufficient warrant(s), and that the vehicle search was supported by an independent source, that is, the valid speeding stop and ensuing dog sniff. (3-ER-339-44). The district court, in an abbreviated order, denied the motion, characterizing it as "very similar" to the first motion, which could be denied simply for being a mislabeled motion for reconsideration. (1-ER-8-10). Nonetheless, it reiterated its earlier ruling that the traffic stop was lawful and the *Leon* good faith exception applied. (*Id.*).

Mr. Hawkins subsequently entered a guilty plea to both counts of a superseding indictment charging him with possession with intent to distribute fentanyl, and felon in possession of a firearm. (3-ER-360). The plea agreement expressly permitted him to appeal the denial of the two motions to suppress discussed above. (3-ER-374). Mr. Hawkins was sentenced to 120 months imprisonment, to be followed by five years supervised release. (1-ER-11-13). This appeal followed.

## SUMMARY OF THE ARGUMENT

The district court erred in denying Mr. Hawkins's motions to suppress, because the evidence ultimately recovered derived from an unbroken chain of tainted evidence. Beginning with a bare bones warrant application that even the district court conceded was insufficient to establish probable cause, law enforcement used GPS location data obtained via that warrant to track Mr. Hawkins traveling to Seattle by air, and later traveling north from Phoenix by car. Law enforcement then used that evidence to obtain a cell site simulator warrant, enabling officers to pinpoint his location. This in turn led to a coordinated effort by federal and local law enforcement to conduct a pretextual traffic stop, which culminated in a K9 search, the results of which were used to obtain a warrant to search the vehicle, leading to the instant charges.

Although the district court correctly found that the first GPS warrant lacked sufficient probable cause, it erroneously found that the *Leon* good faith exception allowed law enforcement to use evidence obtained through the warrant to track Mr. Hawkins and ultimately pinpoint his location and subject his vehicle to a K9 search. But *Leon* only permits use of tainted evidence if officers acted in good faith reliance on a warrant. Here, the affidavit supporting the application for the GPS warrant was so bare bones that no reasonable officer could have relied on its sufficiency. Moreover, the fact that McCann deceptively failed to alert the issuing magistrate that the sole member of the DTO allegedly connected to Mr. Hawkins had already been arrested, and that no evidence from the two-year investigation linked Mr. Hawkins to the DTO, precludes the government from taking advantage of the good faith exception. In addition, a line of cases from this Court holds that illegally obtained evidence cannot be sanitized by inserting it into a new warrant application, particularly where law enforcement, rather than the issuing magistrate, was the source of the error.

The district court's alternative basis for upholding the vehicle search—that it was supported by the independent source of a valid traffic stop—was incorrect, because the traffic stop cannot be separated from the chain of events underlying the GPS and CSS warrants. The circumstances make clear that but for evidence gained from those warrants, there never would have been a traffic stop on that date or in

17

that location. And even if there was, nothing about the circumstances of the stop would have justified expanding it to include a K9 search. Therefore, the warrant to search the vehicle was irreparably tainted by the chain of illegality that began with the first warrant, and the court erred in denying the motions to suppress.

## ARGUMENT

I. THE DISTRICT COURT CORRECTLY HELD THAT THE WARRANT TO TRACK MR. HAWKINS'S COMMUNICATIONS AND MOVEMENTS VIA GPS WAS NOT SUPPORTED BY PROBABLE CAUSE

A. Preservation and Standard of Review

Mr. Hawkins filed two motions to suppress, which are found at 2-ER-34 and 3-ER-281. The district court's orders denying the motions are found at 1-ER-2 and 1-ER-8.

This Court reviews *de novo* a district court's denial of a motion to suppress evidence, including the application of the good faith exception to the exclusionary rule. *United States v. Needham*, 718 F.3d 1190, 1193 (9th Cir. 2013). Factual findings are reviewed for clear error. *United States v. Monghur*, 588 F.3d 975, 978 (9th Cir. 2009).

18

**B.** <u>The First Affidavit Was Insufficient to Establish Probable Cause That Electronic Data For The Phone Identified As "TT86" Would Yield Evidence That Mr. Hawkins Was Engaged In Drug Trafficking or Was Associated With the Michael Walker DTO</u>

"A search warrant is supported by probable cause if the issuing judge finds that, 'given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Although a reviewing court must give deference to an issuing judge's probable cause determination, where such decision was clearly erroneous, it must be overturned. *United States v. Krupa*, 658 F.3d 1174, 1177 (9th Cir. 2011). Where, as here, a search warrant is based solely on an informant's tip, "the proper analysis is whether probable cause exists from the totality of the circumstances to determine a sufficient level of reliability and basis of knowledge for the tip." *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001) (citing *Gates*, 462 U.S. at 238 (1983)).

In this case, the information provided in the affidavit was insufficient to establish a fair probability that evidence of drug trafficking would be found through an intrusive, far-reaching warrant to track Mr. Hawkins's phone calls and movements. The only information McCann provided in her affidavit was:

- That a CS had related that someone named "Kendle" supplied cocaine to Kenneth Lee, who was known to the government as a member of the DTO under investigation;

- That "Kendle" lived in Arizona and used rental cars to transport cocaine from Arizona to Seattle;

- That the CS had provided a phone number for "Kendle," which the government designated "TT86;"

- That law enforcement had used databases to determine that TT86 was associated with an address in Phoenix, Arizona that was listed for Kendle Hawkins; and

- That subscriber information for TT86 showed a different billing address, also associated with Kendle Hawkins, though the phone was not subscribed in his name.

The affidavit provided no information regarding the basis for the CS's knowledge, nor did it provide information as to specific dates or timeframes when Mr. Hawkins supposedly drove to Seattle to distribute drugs. Moreover, despite the government having apparently located two different addresses associated with Mr. Hawkins, there is no indication agents investigated whether he was living at either of those addresses or attempted to conduct physical surveillance at either location. To the contrary, McCann represented without elaboration that investigators had had

20

"limited success" in identifying the residences of any of the targets named in the affidavit. (2-ER-87).

This Court has identified several factors to be considered in determining the reliability of an informant's tip. *United States v. Rowland*, 464 F.3d 899 (9th Cir. 2006). These factors include: 1) whether the informant is known; 2) whether the informant has a proven track record of reliability; 3) whether the informant reveals the basis of his knowledge; and 4) whether the tip provided detailed predictive information about future events that is corroborated by police observation. *Id.* at 907-08 (internal citations omitted). In this case, although factors (1) and (2) weigh in favor of reliability, factors (3) and (4) are wholly absent. The affidavit provided no information regarding the basis of the CS's knowledge, and gave only the most general predictive information, which the agents did not even attempt to corroborate.

In a case with similar facts, this Court held that corroborating only innocent details supplied by an informant cannot support a finding of probable cause. *United States v. Freitas*, 716 F.2d 1216, 1221 (9th Cir. 1983). In *Freitas*, two unrelated and previously reliable informants supplied tips that the defendants were importing narcotics using a furniture company as a cover. *Id.* Officers then observed the defendants at a warehouse loading furniture into a van, taking a circuitous route through the area, and eventually returning to the warehouse, where they were

observed loading a large wicker basket into the furniture van. *Id.* This Court reversed the district court's denial of the defendants' motion to suppress, finding that the affidavit failed to show corroboration of anything but innocuous details. *Id.*

The affidavit in this case provides even less predictive information, and agents performed even less investigation. Unlike in *Freitas*, only one informant, not two, supplied information. And also unlike in *Freitas*, law enforcement conducted no surveillance that would tend to corroborate the CS's allegation that Mr. Hawkins rented cars, drove from Arizona to Seattle, or was engaged in drug trafficking at all.

In another case with similar facts, this Court upheld a district court's suppression order, finding the warrant at issue was not supported by probable cause. *United States v. Hall*, 113 F.3d 157 (9th Cir. 1997). In *Hall*, Dang, who had just been arrested on a drug charge, told officers that a man named "Ron," who drove a red and white pickup truck was his source of cocaine. *Id.* at 157. The only other information Dang provided was "Ron's" address. In lieu of an affidavit to search Hall's residence, officers brought Dang before a magistrate judge to give live testimony about Hall. *Id.* at 158. However, the officers failed to provide the magistrate with information about Dang's criminal history, which included convictions for falsely reporting a crime. *Id.* Although the government conceded the officer recklessly failed to disclose the information about Dang's criminal history, it

claimed that even had that information been included, the affidavit and testimony would have been sufficient to establish probable cause. *Id.* at 159.

This Court disagreed, noting that law enforcement did nothing to corroborate the tip other than verifying innocent details and that on the facts, the officer had no way of knowing whether Dang was leading them to his supplier, a competitor, or even someone innocent. *Id.* at 159. Pointing to Dang's history of false statements, it reasoned, "[a] known liar is less worthy of belief than an individual about whom nothing is known. Many perfectly innocent people doubtless drive red and white pickup trucks and live in trailers, and probably drug dealers know some of those innocent people's vehicles by sight and know their names." *Id.* Here, the CS similarly had convictions for crimes of dishonesty, and gave agents even less information than the informant in *Hall* supplied. Indeed, if this Court finds the warrant sufficient to establish probable cause, then all that is needed to subject any individual to intrusive, round-the-clock tracking of their communications and movements is for a paid informant to supply officers with a person's phone number and state of residence.

The district court below agreed with Mr. Hawkins that the information provided in the affidavit in support of the first/GPS warrant was "too thin and insufficiently reliable":

> No evidence was provided connecting Mr. Hawkins to the DTO other than the CS tip, and nothing corroborated this tip other than the fact that the

> phone number was indeed connected to Mr. Hawkins. It is not clear that the tip was based on firsthand knowledge, and it was not sufficiently detailed to describe when, where, with whom, and in what quantity some future drug transaction might occur.

(1-ER-5). The district court also agreed with Mr. Hawkins's contention that by the time McCann applied for the warrant on May 20, 2021, the CS's information was stale because Kenneth Lee, the lone DTO member to whom Mr. Hawkins had allegedly been supplying cocaine, had been arrested six weeks earlier. (*Id.*).

Information underlying a warrant is not stale if there is sufficient basis to believe, based on a continuing pattern or other good reasons, that alleged criminal activity is ongoing. *United States v. Schesso*, 730 F.3d 1040, 1047 (9th Cir. 2013); *see also United States v. Dozier*, 844 F.2d 701, 707 (9th Cir. 1988). Here, however, the CS gave no information to suggest that Mr. Hawkins was distributing drugs to anyone other than Lee, and McCann was aware that Lee had been arrested and charged by the time she wrote her affidavit. For this additional reason, the affidavit failed to establish probable cause.

The district court was correct about the insufficiency of the affidavit, and this Court should similarly find that the affidavit for the GPS warrant was insufficient to establish probable cause. The tip was supplied by a paid informant who had multiple convictions, including for crimes involving dishonesty, and who gave no basis for his knowledge. In addition, the only details law enforcement corroborated were that Mr. Hawkins was associated with the phone number the informant supplied, and

possibly resided in Arizona. Consequently, the warrant was not supported by probable cause.

II. **THE SECOND/CELL SITE SIMULATOR WARRANT WAS INVALID BECAUSE IT CONTAINED NO NEW INFORMATION OTHER THAN GPS DATA OBTAINED VIA THE FIRST TAINTED WARRANT**

As detailed in the statement of facts, after McCann obtained a warrant to track TT86's movements, the phone was observed traveling from Phoenix to SeaTac airport via airplane, and subsequently traveling north from Phoenix towards Sacramento. *See supra* at 7. When agents realized they could not track TT86's precise location as it traveled north on Interstate 5, McCann decided to apply for a cell site simulator warrant to enable law enforcement to pinpoint the phone's location.

The first ten pages of the affidavit in support of the CSS warrant application recite information that is substantially the same as that contained in the affidavit supporting the GPS warrant. (2-ER-218-27). The affidavit then adds the following information:

- That after law enforcement obtained the GPS warrant, on May 23, 2021, GPS location data showed TT86 traveling by air from Phoenix to SeaTac and flying back the same night; and

- That on June 13, 2021, GPS location data showed TT86 traveling north from Phoenix to Sacramento, California by car, stopping for a few hours, and then continuing travelling north.

The only other new representations in the affidavit are generalized claims that Phoenix is a "drug trafficking hub," and that Interstate 5 is a common drug trafficking route between Phoenix and Seattle. (2-ER-227-28).

The district court's order denying the first motion to suppress does not specifically address the CSS warrant. (1-ER-2-7). In its order denying the second motion to suppress, it briefly notes that "the CSS Warrant has the same evidence as the GPS Warrant and more," but fails to specifically address whether the CSS warrant was supported by probable cause. (1-ER-10).

Evidence derived from a Fourth Amendment violation must be suppressed unless it has been obtained "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). Where tainted evidence is included in a warrant application, a reviewing court must excise the tainted evidence and assess whether the remaining, untainted evidence is sufficient to establish probable cause. *United States v. Driver*, 776 F.2d 807, 812 (9th Cir. 1985). Here, because the warrant to obtain the GPS location data was not supported by probable cause, the location data showing Mr. Hawkins's phone traveling by air to Seattle on May 23, 2021 and traveling north from Phoenix by car on June 13, 2021

26

must be excised from the CSS affidavit. This leaves only the same uncorroborated tip from the CS, and the unsupported, general allegation that Phoenix (a metropolitan area of over 5 million people) is a "drug trafficking hub" and that drug traffickers (along with presumably hundreds of thousands of other motorists) use Interstate 5 when traveling to cities along the west coast *Accord, Reid v. Georgia*, 448 U.S. 438, 441 (1980) (rejecting premise that traveling from Fort Lauderdale, an alleged source city for cocaine, arriving at the airport early in the morning, walking ahead of traveling companion and carrying minimal luggage was sufficient to provide even reasonable suspicion of drug trafficking). The CSS warrant is thus similarly invalid.

## III.   THE DISTRICT COURT ERRED IN FINDING THAT THE *LEON* GOOD FAITH EXCEPTION APPLIED

Despite agreeing that the affidavit in support of the GPS warrant was insufficient to establish probable cause, the district court nonetheless denied Mr. Hawkins's motions to suppress. Central to the district court's ruling was its conclusion that the good faith exception articulated in *United States v. Leon*, 468 U.S. 897 (1984) operated to cleanse any taint from the fruits of the GPS and CSS warrants. (1-ER-6-10). Quoting the government's response to Mr. Hawkins's first motion to suppress, the court concluded, "[e]ven if there were flaws in the GPS warrant or subsequent warrants that undermine these three magistrates' findings of probable cause, the *Leon* good-faith exception would apply." (1-ER-6; *see also* 1-ER-

10 ("Even after analyzing the substance of Mr. Hawkins's [second] Motion, the Court continues to find ... that the *Leon* good faith exception applies for the reasons stated by the Court previously and precludes granting the requested relief")). For multiple reasons, the court erred in finding the good faith exception applied.

In *Leon*, 468 U.S. at 922, the Supreme Court limited the applicability of the exclusionary rule, holding that evidence is not subject to suppression if law enforcement acts with objective good faith reliance on a warrant issued by a neutral and detached magistrate, even if the warrant is later determined to be unsupported by probable cause. The government bears the burden of proving that reliance on the warrant was objectively reasonable. *United States v. Kow*, 58 F.3d 423, 428 (9th Cir. 1995).

*Leon*, however, contains several exceptions. "[T]he officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable ... and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Leon*, 468 U.S. at 922-23. The Court identified four situations in which suppression remains an appropriate remedy: 1) if the issuing magistrate was misled by false information or material omissions; 2) if the issuing magistrate wholly abandoned his judicial role; 3) if the warrant was based on an affidavit so lacking in indicia of probable cause as to render official reliance on its

existence unreasonable; or 4) if a warrant is so facially deficient that executing officers cannot presume it to be valid. *Id.* at 923. Officers are "required to have a reasonable knowledge of what the law prohibits." *Id.* at 919 n.20.

## A. The Affidavit in This Case Was So Bare Bones That Agent McCann Could Not Reasonably Have Relied on It

An affidavit that fails to establish "at least a colorable argument for probable cause" fits within the "narrow exception" to *Leon*'s good faith reliance rule. *United States v. Grant*, 682 F.3d 827, 836 (9th Cir. 2012) (citing *United States v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006)). The test is an objective one, and requires an assessment of "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23.

In *Luong*, this Court found the good faith exception did not apply where, just as in this case, the affidavit was premised solely on a tip that failed to include any predictive details and where law enforcement failed to corroborate anything but innocent details. 470 F.3d at 903. The affidavit in *Luong* asserted the following: that a multi-agency investigation of a Taiwanese national, Jao, was underway; that Jao had arrived in Los Angeles and checked into a hotel, where Luong then arrived and met with him; and that the two then left the hotel and drove to a residence, from which they subsequently departed, drove to a Home Depot, and purchased an adapter for a hose. *Id.* at 900. Jao and Luong then drove back to the residence, and although agents surveilled the home for another seven hours, they observed nothing

29

suspicious. *Id.* The only other basis the agent cited for the warrant was that the hose Jao and Luong possessed was a "common tool" used in methamphetamine production. *Id.*

This Court found the affidavit insufficient to establish probable cause. Noting that there was no information about the basis of the tip, it stressed that agents failed to corroborate anything other than innocent details. *Id.* at 903. After rejecting the government's attempt to introduce extrinsic evidence to bolster its claim that the executing officers acted in good faith, it held that because the underlying affidavit was "entirely lacking in indicia of probable cause," it fit squarely within the situation identified in *Leon* in which the good faith exception does not apply. *Id.* at 904-05.

Here, just as in *Luong*, the CS's tip failed to provide any predictive information, and the investigating agents similarly failed to corroborate any details other than that Mr. Hawkins likely resided in Arizona and was tied to the cell phone number the CS provided. And just as in *Luong*, the agent attempted to make up for the lack of indicia of probable cause by characterizing innocent conduct—residing in Arizona, traveling to Seattle, having a phone linked to a different primary accountholder's name—as indicative of drug trafficking.

In *United States v. Angulo-Lopez*, this Court stressed that in assessing the probative value of innocent conduct, a court must evaluate both whether conduct is innocent and the degree of suspicion that attaches to particular noncriminal acts. 791

F.2d 1394, 1397-98 (9th Cir. 1986). Under this framework, living in a major metropolitan area and traveling to another major metropolitan area, something millions of Americans do every day, is simply not probative of criminality; similarly, millions of Americans have cell phones tied to different accountholders for financial reasons,[4] considerably limiting any probative value that might attach to that fact.

This Court similarly refused to apply the good faith exception in another case in which the warrant failed to include sufficient information to support a probable cause determination. *Grant*, 682 F.3d at 836. In *Grant*, officers sought a warrant to search the defendant's home for evidence of a gun associated with a homicide that had occurred nine months earlier. *Id.* at 828. The affidavit detailed that in January 2009, police found a man's body and determined he had died from multiple gunshot wounds. *Id.* at 829. A witness reported he had heard shots and seen a dark-complected Black man with a thin build fleeing the scene. *Id.*

During a search of the victim's home, police found a Blackberry cell phone, for which they obtained records, which showed that the phone had communicated with a number of gang members, including the defendant's son Davonte. *Id.* While investigating Davonte, police learned he had a half-brother named James, who was

---

[4] For example, a survey of 1000 adults aged 18 to 35 found that 32 percent were still on their parents' cell phone plans. *See* https://www.advanced-television.com/2023/12/06/survey-32-millennials-gen-z-have-phone-bill-paid-by-parents/.

taller and thinner than Davonte and therefore better fit the description of the shooter in the homicide case. *Id.* However, subsequent investigation, including DNA testing, failed to yield any direct connection between James and the homicide. *Id.* at 830. The investigating officer nonetheless applied for a warrant to search the defendant's home for evidence of the homicide, relying on the fact that James had visited Adelanto, where defendant lived, and the inference that Davonte made a statement to his mother that linked James to the victim's cell phone. *Id.* A warrant was issued, and the defendant was subsequently charged with illegal possession of two firearms found in his home that were not connected to the homicide. *Id.* at 831.

After the district court denied the defendant's motion to suppress, this Court reversed. Although it found the affidavit did establish a connection between defendant's son Davonte and the homicide, it did not support a reasonable inference that Davonte had brought the gun or ammunition into his father's home. *Id.* at 832. Not only was there no evidence that Davonte had visited the defendant's home after the homicide, Davonte had in fact been incarcerated for several months before the search occurred. *Id.* at 833. And, although the affidavit did establish a connection between defendant's son James and the defendant's home, it failed to establish any basis to believe James was connected to the homicide. *Id.*

The district court found that the application was deficient as to probable cause, but nonetheless upheld the search based on the *Leon* good faith exception.

*Id.* at 836. This Court disagreed, finding the officers' reliance on the warrant "entirely unreasonable," because nothing in the affidavit suggested the defendant had an independent connection to the homicide, nor was there any ground for inferring that his son Davonte visited his home between the homicide and his being jailed three months later. *Id.* "A reasonable officer would know that probable cause is not supplied by stating everything one knows about a particular item one would like to find to solve a murder case, if the mass of facts simply do not plausibly connect the place to be searched for the item sought." *Id.* at 841.

Here, the evidence connecting Mr. Hawkins's phone to the DTO under investigation was similarly weak. Despite having obtained multiple wiretap and tracking warrants, the government admitted it had no evidence Mr. Hawkins had ever been in touch by phone with Lee, the DTO member to whom he was alleged to supply drugs. (2-ER-192). There was similarly no physical surveillance that placed Mr. Hawkins in the same location as any DTO member. And, like the suspect in the homicide in *Grant*, the one DTO member the CS alleged Mr. Hawkins worked with had been arrested weeks earlier. Given the lack of any corroboration of the CS's tip, the investigating agents in this case could not reasonably have relied on the magistrate's issuance of the warrant. This is particularly so given that it was buried within an affidavit seeking a warrant for other phones and individuals for which there *was* sufficient evidence of probable cause.

B. The *Leon* Good Faith Exception Does Not Apply Because the Portion of the Affidavit Relating to Mr. Hawkins's Phone Contained Material Omissions

In his motion to suppress, Mr. Hawkins argued that McCann omitted material information regarding his lack of connection to the Walker DTO that, had it been included, would have dissuaded the magistrate judge from issuing the warrant. (2-ER-52-55). Specifically, he alleged that McCann failed to advise the court that: 1) the Walker DTO had largely been taken down by early April, weeks before she received the tip from the CS; 2) that Lee, the only DTO member the CS alleged Mr. Hawkins worked with, had been arrested on April 7, again weeks before McCann received the tip; 3) that McCann had reviewed Lee's toll records and GPS location data and omitted the fact that Mr. Hawkins's phone never communicated with Lee's; 4) that Lee had another source of supply; and 5) that throughout the surveillance conducted of members of the DTO, Mr. Hawkins had never been seen. (*Id.*).

In response, the government pointed out that McCann's affidavit actually did contain information naming an alternate supplier to Lee, and did state that Lee had been arrested on April 7, 2021. (2-ER-192). With respect to the toll records, McCann explained in an affidavit that when she analyzed Lee's toll records, it was long before she had learned of Mr. Hawkins or had his phone number. (*Id.*). Finally, with respect to McCann's failure to advise the court that she had no evidence connecting Mr. Hawkins to the DTO, either through toll records or surveillance, the

34

government explained away the omissions by speculating that Mr. Hawkins could have communicated with Lee via other means such as Facetime, Facebook Messenger, or WhatsApp, and that the intercepted phone records were incomplete. (2-ER-193).

While the deficiencies in the affidavit arguably did not rise to the level of a *Franks* violation, to the extent that McCann included information about the takedown of the Walker DTO and Lee's arrest in her affidavit, the information was contained in the probable cause recitation relating to a different target. (2-ER-084). The affidavit itself was 34 pages long, and only two paragraphs related to Mr. Hawkins. (2-ER-86). Thus, while it is technically true that the information was not wholly omitted, McCann's choice to omit the information from the probable cause recitation for Mr. Hawkins undermines any claim of good faith.

Nor does the government's protestations that McCann had not known of Mr. Hawkins's phone number at the time she analyzed Lee's toll records excuse her from conducting investigation to corroborate the CS's tip. A simple search of phone records already in the government's possession, including Lee's, would have revealed that Mr. Hawkins's phone number—as the government later admitted— appeared in none of them. (2-ER-210). This information would have been highly relevant to assessing whether there was probable cause to believe the CS's tip,

because the only allegation the CS made that would have connected Mr. Hawkins to the Walker DTO was his association with Lee.

In support of its request for permission to track the movements and calls of five people, the affidavit alleges that all five of them were "associated with the Michael Walker DTO." (2-ER-68). The evidence in the affidavit as to Mr. Hawkins, however, does not bear that out. Indeed, after two years of investigating the organization, McCann had no inkling of Mr. Hawkins's existence until a paid informant with prior convictions for crimes of dishonesty said he was a supplier. Then, after receiving the tip, she and the rest of the investigative team did nothing to determine whether any of the voluminous evidence they had gathered so far linked him to the DTO. Instead, McCann simply inserted the tip into a warrant application for others for whom there *was* evidence to support an inference of membership in the DTO, and failed to alert the magistrate to the lack of evidence as to Mr. Hawkins. Her rejoinder that Lee's previous arrest was inconsequential because he might have been continuing to deal drugs while out on bond borders on the absurd; if law enforcement in fact had evidence Lee was continuing to sell drugs, his bond would have been swiftly revoked.

In short, McCann's affidavit is the opposite of what the *Leon* court had in mind when suspending the exclusionary rule for officers acting "in good faith." Law enforcement took a bare bones tip, failed to corroborate anything material, drafted

the affidavit to appear as if Mr. Hawkins was on par with others in the DTO for whom there *was* substantial evidence of involvement, and then went on an electronic fishing expedition after the fact. All of these actions demonstrate a lack of good faith, and for this reason, the *Leon* exception does not apply.

C. *Leon* Prohibits the Use of Illegally Obtained Evidence to Support Issuance of a Search Warrant

There is another reason why the *Leon* good faith exception should not apply: this Court has repeatedly held that when a search warrant is procured through evidence from prior unlawful searches, the *Leon* good faith exception does not offer the police safe harbor. In *United States v. Vasey*, officers conducted an illegal warrantless search of a vehicle, discovered evidence, and then included that tainted evidence in an affidavit to obtain a search warrant. 834 F.2d 782 (9th Cir. 1987). This Court flatly rejected the government's attempt to invoke the good faith exception, holding that "[t]he fact that [police] conducted a warrantless search of the vehicle which violated Vasey's Fourth Amendment rights precludes any reliance on the good faith exception." *Id.* at 789. In reaching its conclusion, it emphasized the critical distinction between *Leon*, where "the officer presented lawfully obtained evidence to a neutral magistrate" who erroneously found probable cause, and cases like this one, where "the constitutional error was made by the officer... not by the magistrate." *Id.* The Court reasoned that applying the good faith exception in such circumstances would undermine the very purpose of the exclusionary rule, which is

to "alter the behavior of individual law enforcement officers or the policies of their department." *Id.*

In *United States v. Wanless*, this Court reaffirmed that evidence obtained through a search warrant that was issued based on tainted evidence must be suppressed. 882 F.2d 1459 (9th Cir. 1989). The Court explained that where the evidence supporting a warrant was obtained through an illegal search, "the search pursuant to the warrant would be valid only if the legally obtained evidence, standing alone, was sufficient to establish probable cause." *Id.* at 1467. Rejecting the government's good faith argument, the Court concluded that "because the search warrant was issued in part on the basis of evidence obtained from an illegal search of the vehicles, the 'good faith' exception does not apply[.]" *Id.* at 1466-67.

Although this Court has since circumscribed the holdings of *Vasey* and *Wanless* in light of intervening Supreme Court precedent, the core holding—that evidence illegally obtained through police misconduct as opposed to magistrate error cannot be used to establish probable cause—remains intact. *United States v. Artis*, 919 F.3d 1123, 1133-34 (9th Cir. 2019). In *Herring v. United States*, 555 U.S. 135 (2009), the Supreme Court held that in determining whether the good faith exception bars admission of evidence obtained in violation of the Fourth Amendment, a court must evaluate whether the police conduct was "sufficiently deliberate" such that exclusion of the evidence can meaningfully deter the police

misconduct. *Id.* at 144. Finding that in that case, the unlawful arrest occurred due to law enforcement negligently failing to remove a recalled warrant from their database, the Court held that such "isolated negligence" did not warrant application of the exclusionary rule. *Id.* at 137. Drawing on *Herring*, the *Artis* court held that the good-faith exception was not "categorically" inapplicable whenever a search warrant was issued based on tainted evidence, but stressed that if misconduct is sufficiently deliberate, it cannot act as a shield. *Artis*, 919 F.3d at 1133-34.

While this Court has not considered the precise question at issue here, that is, whether evidence derived from a warrant that was not supported by probable cause can be used as the basis for a second warrant, the principles articulated in *Vasey, Wanless* and *Artis* teach that it should not, because McCann's conduct in seeking both the GPS and the CSS warrants was deliberate. Specifically, she was aware: 1) that the CS failed to provide the basis of his knowledge; 2) that officers had failed to conduct any meaningful investigation to corroborate the tip; 3) that by the time she sought the warrant, Lee, the DTO member to whom Mr. Hawkins supposedly supplied cocaine, had been arrested weeks earlier; and 4) that none of the evidence gathered in the two-year long investigation into the Walker DTO had turned up any connection between Mr. Hawkins and the DTO.

Knowing all that, she nonetheless applied for the GPS warrant by inserting two short paragraphs into an application aimed at obtaining renewed authorization

for tracking information for phones of individuals already determined to be associated with the DTO, and initial authorization for a phone number known to have been communicating with Lee on multiple occasions at times when narcotics deals were being arranged. While the magistrate judge arguably should have noticed the dearth of information in the affidavit as it pertained to Mr. Hawkins's phone, as this Court has observed:

> Typically, warrant applications are requested and authorized under severe time constraints. Moreover, warrant applications are considered without the benefit of an adversarial hearing in which the evidentiary basis of the application might be challenged.

*Vasey*, 834 F.2d at 789.

But more important, the deficiencies in the warrant application were a direct result of the way in which McCann structured the affidavit: it was McCann's choice to bury the request in the application for a warrant for the other phones; it was McCann's choice to include negative information about the CS only in a footnote; and it was McCann's choice not to include in the probable cause section relating to Mr. Hawkins that the DTO member to whom he allegedly supplied drugs had already been arrested. Knowing that this application was one of many submitted in the context of a larger investigation for which authorizations had previously been granted, McCann

included Mr. Hawkins even though there was vanishingly little evidence that
he was in any way connected to the DTO under investigation.

The good faith exception represents a balance between the costs of excluding
evidence and the benefits of deterring police misconduct. When officers deliberately
exploit prior constitutional violations to obtain a warrant, applying the exception
would eviscerate the exclusionary rule's deterrent effect. If the tainted fruits of the
GPS warrant are excised from the CSS warrant application, there was no basis on
which to issue a warrant. Furthermore, as explained below, the traffic stop and
discovery of evidence leading to the issuance of the third warrant were inextricably
intertwined with the first two warrants, and cannot be vindicated by the good faith
exception.

IV. THE TRAFFIC STOP DOES NOT PROVIDE AN INDEPENDENT
SOURCE FOR THE DISCOVERY OF THE EVIDENCE LEADING
TO THE SEARCH OF THE VEHICLE IN WHICH MR. HAWKINS
WAS TRAVELING

In its orders denying Mr. Hawkins's motions to suppress, the district court
ruled, as an alternate basis for upholding the search of the rental car, that it was
supported by an independent source, that is, that the car had been validly stopped
for speeding. (1-ER-5; 1-ER-10). However, because the government's entire
investigation leading to the discovery of contraband was irreparably tainted by the
invalid GPS and CSS warrants, the independent source doctrine is inapplicable. The
traffic stop would have been impossible but for the fruits of those warrants, because

the ability to precisely pinpoint Mr. Hawkins's location was wholly dependent on location data gained from the tainted CSS warrant, which was in turn obtained using data harvested through the tainted GPS warrant. To satisfy the independent source doctrine, the government would need to prove that officers would have conducted the traffic stop of Mr. Hawkins's specific vehicle even if they had never obtained the tainted GPS and CSS data. This is a burden it simply cannot meet.

Three related doctrines grant the government relief from the exclusionary rule: attenuation, independent source, and inevitable discovery. Though distinct from each other, this Court has noted that the core inquiry in all three is "whether the police would have discovered the evidence if the misconduct had not occurred." *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989)(quoting *United States v. Namer*, 835 F.2d 1084, 1087 (5th Cir. 1988)). In a recent case discussing the inevitable discovery exception, the Court stressed that there can be "no speculative elements" in demonstrating that law enforcement would have found the evidence independent of its own unlawful actions. *United States v. Holmes*, 121 F.4th 727, 737 (9th Cir. 2024).

The exclusionary rule applies when the illegally obtained evidence "tend[ed] to significantly direct the investigation to the evidence in question." *United States v. Johns*, 891 F.2d 243, 245 (9th Cir. 1989) (quoting *United States v. Chamberlin*, 644 F.2d 1262, 1269 (9th Cir. 1980)). In *Murray v. United States*, the Supreme Court

established a two-part test for determining whether tainted evidence falls within the independent source exception: such evidence is admissible only if "no information gained from the illegal [conduct] affected either [1] the law enforcement officers' decision to seek a warrant or [2] the magistrate's decision to grant it." 487 U.S. 533, 540 (1988). *Murray* underscored the "truly independent" requirement, establishing that the "ultimate question ... is whether the search pursuant to the warrant was in fact a genuinely independent source of the information and tangible evidence at issue here." *Id* at 542. The Court focused on actual causation rather than the premise that evidence can qualify as independently obtained merely because it *could have been* discovered lawfully; independence requires that officers' decision to pursue the lawful method was not prompted by evidence discovered as a result of the illegality. *Id.*

Dissenting in *Murray*, Justice Marshall provided the clearest example of when the independent source doctrine *should* apply: "The clearest case for the application of the independent source exception is when a *wholly separate line of investigation*, shielded from information gathered in an illegal search, turns up the same evidence through a separate, lawful search. Under these circumstances, there is little doubt that the lawful search was not connected to the constitutional violation." *Id.* at 545 n.1 (Marshall, J. dissenting) (emphasis in original). That, however, is not what happened here.

The district court erroneously found that because it is legal for officers to stop a driver who is traveling over the speed limit, there was a basis to stop Mr. Hawkins's car that was independent of the two tainted warrants, which in turn gave rise to the dog sniff and subsequent warrant to search the car. The problem with this analysis is that the stop was *not* independent of the two tainted warrants. Far from it. The very ability to locate Mr. Hawkins's vehicle among thousands traveling on Interstate 5 was entirely dependent on information obtained through the tainted GPS and CSS warrants. Without the illegally obtained tracking data, officers would not have known whether Mr. Hawkins might be traveling towards Seattle on any particular day, and definitely would not have known his precise location at any given time.

One need look no further than the CSS warrant application itself: the government's stated reason for applying for the CSS warrant was that they would otherwise have been unable to locate Mr. Hawkins's vehicle on the busy interstate. Put another way, without information gained from the GPS and CSS warrants, the only way officers could have apprehended Mr. Hawkins en route to Seattle would have been to station officers along I-5 every day, 24 hours a day, starting from the date they received the CS's tip, and stop every speeding vehicle in the hopes that one of them might contain Mr. Hawkins and a stash of drugs. There is simply no universe in which this might have occurred.

44

The circumstances surrounding the stop demonstrate just how improbable an independently sourced traffic stop would have been. The drive from Phoenix to Seattle took place *weeks* after agents received the CS's tip. Multiple agencies coordinated their efforts—the FBI tracked Mr. Hawkins's movements; a task force officer ran the license plate, discovering the vehicle was rented; a local police sergeant tracked the speed; and another local officer, who was accompanied by his K9 and a task force officer, executed the stop. (2-ER-162). This level of interagency cooperation underscores that far from being a routine traffic enforcement action, this was a coordinated effort that represented the culmination of a targeted investigation that cannot be disentangled from the tainted warrants.

The Ninth Circuit has recognized that artificially segmenting coordinated police actions undermines Fourth Amendment protections. *United States v. Gorman*, 859 F.3d 706 (9th Cir. 2017). "When the result of one [police action] is communicated and, on that basis, another [action] is planned and implemented, the coordinated [actions] become, in effect, one integrated [operation] that must as a whole satisfy the Constitution's requirements." *Id.* at 719. This approach honors the Supreme Court's emphasis on genuine independence rather than formalistic separation. The court plainly stated what should be obvious: "[a]n illegal police venture cannot be made legal simply by dividing it into two coordinated stops." *Id.*

45

*Gorman*'s teachings hold true here. This was never a traffic stop about individuals traveling eight miles an hour over the speed limit; it was instead always a stop about a narcotics investigation. The record clearly bears that out: in her affidavit, McCann explains that Mr. Hawkins was stopped "on the basis of the speeding infraction and the independent probable cause developed by agents from CS information, GPS location data, and the physical surveillance[.]" (2-ER-139). In her report detailing the stop, she repeats that officers "conducted a traffic stop of the Subject Vehicle on the basis of the speeding infraction and the independent probable cause developed by agents from CS information, GPS location data for TT86, and physical surveillance." (2-ER-161). The government, in its response to Mr. Hawkins's motion to suppress, also did not shy away from characterizing the stop as primarily to investigate drug trafficking. (*see* 2-ER-176: "The K-9 sniff furthered the stoop's purpose—to investigate drug trafficking."). Thus, the government's and its agent's own words belie any claim of independent source. Because the stop in this case was inextricably intertwined with the tainted GPS and CSS warrants, the fruits of the stop, which include the results of the K9 sniff and ensuing warrant to search and its fruits, must be suppressed.

## V. EVEN IF THE TRAFFIC STOP COULD BE JUSTIFIED ON INDEPENDENT GROUNDS, THE STOP WAS IMPERMISSIBLY EXTENDED FOR THE PURPOSE OF CONDUCTING A NARCOTICS INVESTIGATION

Even assuming the traffic stop functioned as an independent source unaffected by the tainted warrants, the evidence must still be suppressed because officers lacked reasonable suspicion to extend the stop for a drug investigation. This extension—deploying a drug-sniffing dog during what began as a routine traffic stop for speeding—violated the Fourth Amendment's prohibition against unreasonable seizures and rendered any subsequently discovered evidence inadmissible.

The Supreme Court established a clear constitutional framework for traffic stops in *Rodriguez v. United States*, 575 U.S. 348 (2015). Under *Rodriguez*, a traffic stop becomes unlawful when it is "prolonged beyond the time reasonably required" to complete the stop's mission, here, addressing the traffic violation that justified the initial seizure. *Id.* at 350. The Court explicitly rejected the government's argument that an officer may prolong a stop to conduct unrelated investigations so long as the overall duration remains "reasonable." *Id.* at 356. Instead, it stressed that the Constitution imposes a strict rule: once the tasks related to the traffic infraction are completed or reasonably should have been completed, extending the stop, even briefly, for unrelated investigative purposes requires independent reasonable suspicion of criminal activity. *Id.* at 354-55.

47

Critically, the timing of the unrelated investigation within the stop is irrelevant. As the Ninth Circuit explained in *United States v. Landeros*, "the Court made clear that it would not have mattered if the police officer conducted the dog sniff test before, rather than after, he issued the warning. What mattered was the added time, not at what point, in the chronology of the stop, that time was added." 913 F.3d 862, 866 (9th Cir. 2019). A dog sniff is not part of a routine traffic stop's mission because it is "a measure aimed at detect[ing] evidence of ordinary criminal wrongdoing," unlike checking license, registration, or outstanding warrants, which are traffic-related inquiries. *Rodriguez*, 575 U.S. at 355 (internal quotations omitted).

Viewing the traffic stop in isolation as the Court must, nothing that occurred during the stop provided the reasonable suspicion needed to justify its extension for a drug investigation. Reasonable suspicion exists only "when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000). While the threshold is lower than probable cause, it still requires more than an "inchoate and unparticularized suspicion or hunch." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (internal quotation marks omitted).

The factors observed by officers during this traffic stop fall woefully short of this standard. First, the driver (Appleton) explained he had been visiting his

48

girlfriend in Arizona and had limited luggage because he maintained clothes at her residence—a wholly ordinary arrangement for someone who travels regularly between locations. Second, Mr. Hawkins mentioned he planned to fly back rather than make the return drive—again, a common travel arrangement that thousands of Americans make daily. Third, officers observed a high-capacity magazine, which Mr. Hawkins promptly identified as unloaded, and which was entirely legal to possess in Washington state at that time.[5] And even if it were not, drug detection dogs are not trained to alert to firearms, and there is no indication the police otherwise extended the stop to investigate the magazine, all of which underscores the conclusion that this was always an investigation about drugs and nothing else.

The officers' claim that Appleton appeared "nervous" would fare no better in establishing reasonable suspicion. The Ninth Circuit has repeatedly recognized "nervousness," to be a factor carrying minimal weight since "[e]ncounters with police officers are necessarily stressful for law-abiders and criminals alike." *United States v. Chavez-Valenzuela*, 268 F.3d 719, 726 (9th Cir. 2001). This Court has recognized that such fears are heightened for Black men. *See Washington v. Lambert*, 98 F.3d 1181, 1192 (9th Cir. 1996). The upshot is that the circumstances the officer

---

[5] Under Washington law, it is illegal to have a *loaded* pistol in a vehicle without a concealed carry license. *See* RCWA 9.41.050 (2003). Additionally, Washington did not regulate the sale of large capacity magazines until 2022, after the stop in this case. *See* RCWA 9.41.370 (eff. July 1, 2022).

observed would not have justified extending the traffic stop beyond the issuance of a traffic citation. Indeed, the officers never even followed up on the traffic violation. Instead, they immediately removed both men from the vehicle to facilitate the dog sniff, betraying the true and only purpose of the stop.

The district court's analysis on this point misses the mark entirely. The court stated that "the traffic stop was valid, the officers on the scene had reasonable suspicion of a crime [and] they extended the stop consistent with their larger mission..." (1-ER-6). But this bootstrapping logic fails to identify what specific, articulable facts observed during the stop (omitting evidence obtained from the tainted warrants or CS's tip) gave rise to reasonable suspicion that would have justified a dog sniff. The court cannot simply declare that reasonable suspicion existed without identifying the specific facts supporting that conclusion.

The reality is that the traffic stop and the subsequent dog sniff were inextricably linked to the tainted warrants. Evidence qualifies as "fruit of the poisonous tree" when "the illegal activity tends to significantly direct the investigation to the evidence in question." *Johns*, 891 F.2d at 245. Here, there was an unbroken causal chain from the illegal tracking to the traffic stop to the dog sniff. The idea that any officer would have randomly pulled over this specific vehicle on I-5, immediately deployed a drug dog rather than writing a speeding ticket, and discovered the same evidence, stretches credulity beyond its breaking point.

50

Without the dog sniff (which in itself raises questions, given the dog's lack of training to detect fentanyl and its alert on a part of the car that was far from where the drugs were ultimately discovered), there would have been no basis for the warrant to search the car nor, contrary to the government's assertion below, would there have been probable cause sufficient to satisfy the automobile exception. The case against Mr. Hawkins thus collapses under the weight of the illegality from the unbroken causal chain beginning with the GPS warrant affidavit and ending with the dog sniff. This Court should therefore reverse the district court's denial of the motions to suppress.

## CONCLUSION

For the foregoing reasons, Mr. Hawkins respectfully requests that this Court reverse his convictions and remand for a new trial.

DATED this 21st day of May, 2025

Respectfully submitted,


*s/ Lynn C. Hartfield*
LAW OFFICE OF LYNN C. HARTFIELD, LLC
Attorney for Appellant Kendle Rashen Hawkins

## STATEMENT OF RELATED CASES

There are no known related cases.

DATED this 21st day of May, 2025

> _s/ Lynn C. Hartfield_____
> LAW OFFICE OF LYNN C. HARTFIELD, LLC
> Attorney for Appellant Kendle Rashen Hawkins

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(B)(i), the foregoing Opening Brief is

proportionally spaced, has a typeface of 14 points, and contains 11,977 words

DATED this 21st day of May, 2025

*s/ Lynn C. Hartfield*_____
LAW OFFICE OF LYNN C. HARTFIELD, LLC
Attorney for Appellant Kendle Rashen Hawkins

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2025, I electronically filed the foregoing Opening Brief and accompanying Excerpts of Record, Volumes 1 through 3 with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF System. I further certify that a copy of the Opening Brief and all Excerpts of Record will be sent to Appellant Kendle Hawkins, who is currently in transit within the Bureau of Prisons, as soon as he reaches his designated institution.

DATED this 21st day of May, 2021

*s/ Lynn C. Hartfield*
LAW OFFICE OF LYNN C. HARTFIELD, LLC
Attorney for Appellant Kendle Rashen Hawkins